CASE 90.—ACTION BY CHARLES THRUSTON JOHNSON AGAINST THE LOUISVILLE BOARD OF FIRE UNDERWRITERS AND OTHERS.—May 14, 1909.

# Louisville Board Fire Underwriters, &c. v. Johnson

Appeal from Jefferson Circuit Court (Chancery Branch, Second Division).

SAMUEL B. KIRBY, Judge.

Judgment for plaintiff, defendant appeals.—Reversed.

1. Contracts—Restraint of Trade—Contracts providing for a reasonable restraint of trade are valid.
2. Associations— By-Laws.—Voluntary and other associations may adopt reasonable rules for the government of their members, and enforce compliance with them.
3. Associations—By-Laws—Validity—Underwriters.—A by-law of a voluntary unincorporated business association of fire under-

writers, membership in which is a valuable property right, providing that no member shall take the agency of a company which has already an existing agency in the city, is valid, reasonable, and not in violation of public policy, the object of the organization being to regulate the fire insurance business to promote the good of its members, and no injury resulting to the public, but rather a good.

HELM BRUCE for appellant.

### AUTHORITIES CITED.

18 Am. and Eng. Encyclopedia of Law 83; Queen Ins. Co. v. The State, 86 Texas, 250; 24 S. W. 397; People v. Fisher, 14 Wend., Note 9; 28 Am. Dec. 508; Collins v. Locke, 4 App. Cas. 674; Association v. Walsh, 2 Daly, 1; Ladd v. Manufacturing Co., 53 Tex. 172; Continental Ins. Co. v. Board of Fire Underwriters of the Pacific, et al., 67 Fed. 310; Matthews v. Associated Press, 136 N. Y. 333; 32 N. E. 981; National Protective Asso. v. Cuming, 170 N. Y. 315; 63 N. E. 369; Jacobs v. Cohen, 183 N. Y. 207; 76 N. E. 5; Macauley v. Tierney, 19 R. I. 255; 37 L. R. A. 455; Montgomery Ward & Co. v. South Dakota Retail Merchants' Asso., 150 Fed. 413; Bohn Manufacturing Co. v. Hollis, 54 Minn. 223; 40 Am. St. Rep. 319; Carew v. Rutherford, 106 Mass. 1; Snow v. Wheeler, 113 Mass. 179; Vandiver v. Robertson & Son, 125 Mo. Appeal, 307; More v. Bennet, 140 Ills. 69; 29 N. E. 888; People v. Chicago Live Stock Exchange, 170 Ill. 556; Huston v. Reutlinger, 91 Ky. 333; Hilton v. Eckersley, 6 El. and Bl. 76; Stanton v. Allen, 5 Denio, 434; People v. Fisher, 14 Wendell, 19; Morris Run Coal Co. v. Barclay Coal Co., 68 Pa. St. 173; Sayre v. Louisville Union Benevolent Asso., 1 Duvall, 146; Sutton v. Head, 86 Ky. 156; Gibbs v. Consolidated Gas. Co., 130 U. S. 396; Mogul Steamship Co. v. McGregor, 21 Q. B. Div. 544.

HARDIN H. HERR and MARION W. RIPY for appellee.

(No brief in record for appellee.)

OPINION OF THE COURT BY JUDGE CARROLL.—Reversing.

The Louisville Board of Fire Underwriters is a voluntary, unincorporated association of fire insurance agents in the city of Louisville, without any capital stock, and is governed by a constitution and by-laws adopted by its members. The object of the association, as declared in its constitution, "is the promotion of harmony and correct practices in the business of fire and tornado underwriting; the establishment and maintenance of fair rates of fire and

tornado insurance; the regulation and employment of solicitors, as to their number and conditions; the adoption of such rules and regulations, and their enforcement by the imposition of fines, penalties and expulsions for violation as the best interests of fire and tornado underwriting may seem to require; and to do any and all things as in their judgment may redound to the improvement and elevation of the business of fire and tornado insurance. It shall have jurisdiction over all fire and tornado business of insurance taken by its members and prescribe a uniform manner of conducting said business.'' It is organized as a business body, and its members, by reason of their connection with it, are given a standing as insurance men, and their integrity, ability and fidelity in the discharge of their duties, and in dealing with the public, is in a measure at least guaranteed by the fact that they are members of this board. The board occupies an office, and owns maps, charts, and other valuable property essential to the transaction of business by fire insurance agents, and charges a membership fee of $500. Johnson prior to 1906 became a member of the board, and in this last-named year he represented two fire insurance companies as their agent, but was obliged to surrender the agency of one of the companies because it ceased to do business in the State of Kentucky. After losing the agency of this company he became the agent of another that already had an agency in the city of Louisville. After he accepted the agency of the company that then had an agency in the city, the board was about to take action against him looking towards his expulsion from the board because he violated a section of the constitution reading: ''No member of this board shall

take the agency of a company which has already an existing agency in the city of Louisville." Thereupon Johnson brought this action against the board to enjoin it from expelling him from membership, upon the ground that the clause in the constitution providing that no member "shall take the agency of a company which has already an existing agency" was unreasonable, arbitrary, illegal, and a violation of the laws of the State of Kentucky and its public policy as promulgated in legislative enactments and decisions of its courts, and because the enforcement of the rule denied him the right to follow a business from which he earned a living for himself and family, and was in restraint of trade. In its answer the board set up that, when Johnson applied for membership he agreed to abide by all its rules and regulations, among which was the one he assails, and that, although he had paid $500 for membership, he had received in dividends from the board during the period of his membership some $455 and also the benefits and advantages accruing from membership, and that the amount received by him in money, together with the benefits attaching to membership, more than compensated him for the amount paid as an admission fee. The answer further averred, in substance, that prior to the adoption of the rule in question, great confusion frequently resulted from the fact that an insurance company would have several different agents in the city of Louisville representing it, each wholly independent of the other, the result being that there was conflict and disorder in the handling of the business of these companies, and it was believed that it would be promotive of the orderly conduct of the business by companies if they had only

one agent in the city; that the effect of having one agent would be to elevate the character of the agent selected, and make each agent more conservative and careful in his manner of doing business; that the rule does not prevent an agent who is a member of the board from representing as many insurance companies as he can induce to give him their agencies, provided only that each of them has no other agent representing it in the city, nor does it prevent any insurance company from having as many agents as it chooses, but if it has more than one, such agents can not become members of the board; that the rule was not intended to affect, and has not in any degree affected, the cost of insurance, or raised the rates, but was only intended to regulate the manner of conducting the business and to prevent conflict and confusion therein and to elevate the character of agents. The lower court sustained a general demurrer to the answer, and entered a judgment enjoining the board from expelling, suspending, or otherwise punishing Johnson for his violation of the rule in question. From this judgment the board appeals, and asks us to set it aside, and permit it to enforce compliance with the rule by the infliction of such punishment, by expulsion or otherwise, as the board in its judgment and under its constitution and by-laws has the power to impose.

That membership in this board is a valuable privilege can not be denied. It gives to agents a business standing as insurance men, and is also a guaranty to the public that in the performance of their duties they will act with fidelity and integrity. The further fact that it owns maps, charts, and other valuable property for the use and benefit of its members that

are essential to the successful conduct of fire and tornado insurance business in a large city increases the benefit that membership confers, and, of course, to be expelled from the board, and thereby deprived, not only of the use of its maps, charts, and other property, but of the business standing that attached to membership, would work serious loss and disadvantage to any person desiring to engage in the business of fire insurance. It may be remarked at the outset that, although the rule in question does not violate any written law, statutory or constitutional, of the State, yet if it should be found to be in contravention of the pronounced and established public policy of the State, the board would not be permitted to enforce it. So that the decision of the case depends upon the question whether or not the rule Johnson disobeyed violates the public policy of this State. If it does not, the board, in furtherance of the objects for which it was formed, had the legal right to incorporate it in its constitution and by-laws, and to enforce compliance with it, and the courts will not undertake to interfere with its action in expelling a member who upon due notice after a fair hearing and trial in accordance with the by-laws of the board has been found guilty. It must be kept in mind that the record does not show that the purpose of this board, or the object of its establishment, was to fix, regulate or control insurance rates. The complaint of Johnson is not put upon the ground that the board is an illegal organization, or upon the ground that the public is injuriously or at all affected by its rules and by-laws, or any of them, but is rested distinctly and alone upon the proposition that the rule is an unlawful restraint upon trade, and an unwarranted inter-

ference with the right of the individual to make such contracts and enter into such engagements as he desires, and hence the board had no authority to enact a rule denying to him, or other members, the right to accept agencies for as many companies as they could get without regard to whether the companies had other agents in the city or not. With the record in this condition it is not necessary that we should express any opinion upon the question of the power, or authority of a board or other association, whether incorporated or not, to fix, regulate or control insurance rates, and so in considering the case we will confine ourselves to the precise question presented by the record.

We have been furnished by counsel for appellee with a number of authorities, some of which sustain Johnson's contention, but in others the decision of the court was put upon the ground that the purpose of the association involved was to control the prices of labor or commodities, or fix the rates or fees that common carriers and other persons might charge. Among the latter class of cases we may notice Sayre v. Louisville Union Benevolent Association, 1 Duv. 143, 85 Am. Dec. 613. In that case the association was incorporated for the purpose of affording relief and assistance to its sick or disabled members and their families, and was authorized to adopt such rules for their mutual interest as individuals and common carriers as should seem proper and promotive of mutual confidence and good will. The association adopted by-laws excluding from membership any person who had not been a captain, owner, or part owner of a steamboat on the Mississippi or Ohio river or tributaries, declaring that no member ''shall go

into any river or trade and work for less than the wages, nor take, bargain for or carry any freight for less than the established rate in the trade; that any member so doing shall be fined not less than one nor more than ten hundred dollars.'' Sayre became a member of the association, and, like the other members expressed his consent to the by-laws by subscribing his name to them. Afterwards the association imposed a fine upon him for violating several of its rules, among them being the one fixing the rate for carrying freight. The decision of the court holding the by-law invalid was distinctly put upon the ground that the association had no right to enact a rule forbidding members from carrying freight for less than the rate fixed by the association, without reference to the question whether the rate was reasonable or not.

Nash v. Page, 80 Ky. 539, 4 R. 477, 44 Am. Rep. 490, was a controversy between the proprietors of tobacco warehouses in Louisville upon the one hand, and buyers of tobacco upon the other. The buyers, becoming dissatisfied with the fees charged by the warehousemen, organized what was called the ''Tobacco Board of Trade,'' and soon thereafter a new warehouse was opened that charged fees agreeable to the buyers. Thereupon the Tobacco Board of Trade adopted by-laws, by which warehousemen who were members of the board were prohibited from selling tobacco publicly or privately, to any but members of the board, or to applicants for membership, and the members were also prohibited from buying from any warehouse in the city the proprietors of which were not members. Following this, the warehousemen whose fees were objectionable to the buyers agreed among

themselves that they would close their warehouses, and open as commission merchants for the sale of tobacco and other products, charging the same fees as theretofore, and, when the buyers offered to purchase tobacco at the houses of the warehousemen, they were denied the right, and brought an action against the warehousemen, asking that they be enjoined from refusing them permission to make purchases at their several warehouses. In holding that the warehousemen could not prevent persons from buying tobacco at their houses, the court said: ''When these warehousemen undertake to dispose of nearly the entire tobacco product of the State at public auction, and when the producer and buyer are not only invited, but, we may say, compelled, to patronize these warehouses that their tobacco may be sold, and the wants of the purchaser supplied, it would be violating every rule of fair dealing to adjudge that the warehouseman shall determine for himself whose tobacco he will sell, and, when offered for sale, what man or set of men shall compete as bidders. Such a doctrine is in violation of the duty the warehouseman owes to the public; a disregard of the statutory regulation of the State on the subject, and opposed to the rule of the common law.'' But, while so holding, the court denied the buyers relief upon the ground that their action was taken not for the public good but for their individual benefit, and so the court would not interfere to aid them in this effort to advance their individual interests. Anderson v. Jett, 89 Ky. 375, 12 S. W. 670, 11 R. 570, 6 L. R. A. 390, involved an agreement between rival steamboats plying on the Kentucky river to fix the rate for freight and passengers. The court held the agreement void upon the

ground that it was against public policy to permit carriers to enter into any agreement that destroyed or interfered with free competition. The same principle was announced in Commonwealth v. Bavarian Brewing Company, 112 Ky. 925, 66 S. W. 1016, 23 R. 2334, and in other cases brought under chapter 101 of the Kentucky Statutes, Secs. 3915-21, prohibiting pools, trusts and conspiracies. In line with the principles announced in these cases is Moore v. Bennett, 140 Ill. 69, N. E. 888, 15 L. R. A. 361, 33 Am. St. Rep. 216, where the court held that an association of stenographers, formed to establish and maintain uniform rates or charges, and to prevent competition among its members under certain penalties, was illegal as in restraint of trade and against public policy. Many other cases might be mentioned that have adopted the principle announced in the authorities cited; but, as they are not applicable to the question presented by the record before us, it will not be necessary to refer to them.

We have also been furnished with some cases that directly sustain Johnson's contentions, notably Houston v. Reutlinger, 91 Ky. 333, 15 S. W. 867, 12 R. 925, 34 Am. St. Rep. 225. In that case Reutlinger, the Franklin Insurance Company, and Union Insurance Company brought an action against the Louisville Board of Underwriters, in which they sought to enjoin the board from enforcing against them certain by-laws adopted by it. The board was a voluntary association, unincorporated, and governed by a constitution and by-laws adopted by its members similar to the constitution and by-laws of the appellant in this case—in fact, the present board of fire underwriters of Louisville is the successor of the board that existed when the

case of Houston v. Reutlinger was disposed of. Among the by-laws of the board was one prohibiting any member of the board from employing more than one solicitor, and fixing a penalty for its violation. Reutlinger and the other complainants violated this rule, and were proceeded against by the board. In considering the case the court held the by-law invalid and said: "While members of voluntary associations must abide by its rules and regulations, unless contrary to the fundamental law of the order, or in violation of the law of the land, and even then the chancellor might be powerless to afford relief, still, when the suspension or expulsion results necessarily, as it must in this case, in affecting the financial standing of the appellees, as well as in depriving them of the use of property that is common to all, however insignificant its value, we perceive no reason for denying the relief sought.   *  *  *   The majority in this case have undertaken to control the business of these appellees, to say how many solicitors they shall employ, and who they shall employ, to renounce all business intercourse with them upon their refusal to submit to rules and regulations that are unreasonable and oppressive; and, with no adequate remedy at law, a court of equity is the proper tribunal from which a restraining order should go preventing this unlawful action on the part of the majority." The Supreme Court of Illinois, in People v. Live Stock Exchange, 170 Ill. 556, 48 N. E. 1062, 39 L. R. A. 373, 62 Am. St. Rep. 404, citing with approval the Houston Case, held that a by-law adopted by the Chicago Live Stock Exchange, which prohibited members from employing trade solicitors not members of the association, and limiting the number of solicitors which

might be employed, and providing how they should be paid, was hostile to the public welfare, in restraint of trade and commerce, and therefore void. In considering the case, the court said: "Combinations and associations of men have no right to place restric- tions upon the right of an individual to contract and engage in business, employing such means and agencies as are not prohibited by law. The natural flow of trade and commerce must be, unrestricted, and men engaged therein may accelerate its current by all means not unlawful. To this end men engaged in trade and commerce may advertise, employ men to solicit business, and offer rewards and inducements to secure trade, without violating the law of the land, and in so doing are exercising a right which is in the interest of the public, because competition can not be hostile to public interests. Efforts to prevent competition, and to restrict individual efforts and freedom of action in trade and commerce, are restrictions hostile to the public welfare, not consonant with the spirit of our institutions and in violation of law." With the exception of the two cases last mentioned we have not found any authority sustaining the position of Johnson. It may, however, be observed that if the Houston Case is adhered to, the judgment of the lower court must be affirmed, as we are unable to find any substantial difference between the question there disposed of and the one here involved.

But, getting back to the precise question before us, it may be stated in this way: Is it against public policy for a body of men to form a business organization or association and adopt rules and by-laws that will in any way interfere with the freedom in business methods that the individuals comprising it could en-

joy if they had not become members, or if the association did not have any rules or regulations controlling the business conduct of its members? Or, to put it in another form, what business privileges that the individual enjoys and exercises as an individual can he lawfully be deprived of by an organization, society, or union that he voluntarily joins? If a business organization, union, association, or board can not curtail any business privileges that the individuals composing its membership enjoyed or exercised before becoming members, or that may be enjoyed or exercised by persons who are not members, it would follow that the board had no authority to enact the rule complained of by Johnson, because it did deprive him of business rights that he might have exercised if not a member. On the other hand, if it is competent for business organizations to enact rules and by-laws for the orderly, safe and legitimate transaction of the business they are engaged in, and to enforce obedience to these rules and regulations by punishing members who disobey them, Johnson's complaint is not well founded, and his appeal to the courts should be dismissed.

It will readily be seen that to deny business bodies the right to adopt and enforce reasonable rules and regulations for the government of its members in the transaction of business would seriously impair, if not destroy, the usefulness of numerous organizations that have been created for business purposes, and that impose such reasonable restrictions upon the membership as in the judgment of the majority are necessary and proper to preserve and promote the purposes of these organizations, many of which are accomplishing great good by reason of the salu-

tary rules they have adopted, and which their members are obliged to observe under pain of expulsion or other punishment.  And so it is generally held by courts that voluntary and other associations may adopt reasonable rules for the government of their members and enforce compliance with them.  Note to Hiss v. Bartlett, 63 Am. Dec. 772; Ryan v. Cudahy, 157 Ill. 108, 41 N. E. 760, 49 L. R. A. 353, 48 Am. St. Rep. 305.  It must also be conceded that the line that separates reasonable and proper rules from unreasonable, arbitrary, and oppressive ones is not at all times entirely clear.  Under the guise of reasonableness a powerful, compact and well-organized body of men might enact rules and by-laws that would have the effect, and were so intended, of crushing out competition and forcing independent concerns to submit or be driven out of business, and so the right to enjoy that freedom and independence of action so important to the growth and development of the individual, and to the encouragement and building up of commercial enterprises, might be virtually destroyed by regulations promulgated under the pretense that they were necessary to promote the orderly conduct of the business and protect the interest of the members.  In this age of combination, in almost every class of business, new schemes are constantly being evolved and put into use to extend the power and influence of unions, boards, and other bodies, and there are now many associations and unions of business and laboring men that have practically entire control of the business they are engaged in, and so thoroughly dominate it that competition by the individual would not be profitable; and so the courts that must at last settle these complex and far-reach-

ing questions should be careful on the one hand not
to impair the usefulness of these associations, and on
the other not to permit them to unreasonably inter-
fere with the personal liberty of the individual, or
stifle competing industries.

In cases like this, the decisive question then is: Is
the rule a reasonable trade regulation, or an unlawful
restriction upon the right of the individual to employ
in the conduct of his business such legitimate means
as are needed to successfully carry it on? If it is not
a reasonable business regulation, it should not be up-
held, no matter when adopted, and little weight in
determining his legal rights should be attached to the
fact that the complaining individual voluntarily be-
came a member, or that the objectionable rule was
in force when he joined. As there are decisions of
courts of last resort upon both sides of this question,
it cannot be said that the correct solution of it is en-
tirely free from doubt, but after carefully considering
the arguments made in support of the respective con-
tentions, we have reached the conclusion that the rule
complained of is not unreasonable, or arbitrary, or
oppressive. It is true that it denies to members priv-
ileges they might enjoy if they were not members,
and restrains them in a measure from the full exer-
cise of personal freedom. But every business organ-
ization, society or association restricts, in more or
less degree, the rights of its members. If these bodies
were not allowed to do this, there would be small use
for organization. No beneficial results could follow
from union if every member was left to do as he
pleased, or these bodies were not permitted to en-
force, by appropriate fines and penalties, the rea-
sonable regulations they have adopted. We have on

every hand evidence of the beneficial and wholesome effects of organized bodies that in every field of human endeavor are accomplishing good in a social, economic and business way. There are few trades, professions or occupations that have not formed themselves into societies, associations or unions for mutual protection and advantage. Each of these organizations has rules that restrict the individual, and require him to do things that he may not desire to do, or refrain from doing things he would like to do. Often, and especially in industrial bodies and labor unions, these rules operate as a partial restraint of trade in the sense that, among other things, they pre- scribe the number of hours a man may work, the per- sons for whom he may work, the wages or compensa- tion that shall be received; but, it is generally held that so long as these regulations are reasonable when applied to the individual, and do not injuriously af- fect the public, they will be upheld. Thus the New York Court of Appeals, in National Protective As- sociation of Steam Fitters v. Cummins, 170 N. Y. 315, 63 N. E. 369, 58 L. R. A. 135, 88 Am. St. Rep. 648, held, in substance, that where a labor union refused to permit its members to work with fellow servants who were members of a rival organization, and noti- fied the employer of that fact, and that a strike would be ordered unless such servants were discharged, the intent being to secure only the employment of its own members on its own terms, the employes who were discharged on demand of the union were denied a right of action against it.

In Matthews v. Associated Press, 136 N. Y. 333, 32 N. E. 981, 32 Am. St. Rep. 741, Matthews sought to restrain the Associated Press from refusing to fur-

nish him with telegraphic news reports. It appears from the opinion that the Associated Press was an incorporated institution, its object being the mutual protection of members of the press in procuring and supplying its members with telegraphic news, upholding and elevating their character and standing, and promoting and maintaining the general interest of the profession and its members. It adopted a by-law providing "no member of this association shall receive or publish the regular news dispatch of any other news association covering a like territory and organized for a like purpose with this association," and fixed a penalty for a violation of this by-law. Matthews, in violation of this rule, received from a rival association news items, and for so doing was about to be expelled or suspended from the Associated Press. In holding the by-law reasonable the court said: "If the by-law be unreasonable or oppressive, or if it tend improperly to restrain trade, and thereby to create a monopoly, or if it be an unlawful interference with a member's right to contract, or if it restrict the liberty of the press, in all or any of these cases the by-law would be beyond the power of the company to adopt or pass, and it would be illegal. The assertion in the moving papers that the by-law tends and was intended to restrain trade does not in any way affect the question. The court must itself construe the by-law, and must decide as to its tendency, while the intention with which it was passed by those voting for it is entirely immaterial upon this aspect of the case. We do not think the by-law improperly tends to restrain trade, assuming that the business of collecting and distributing news would come within the definition of a trade. The lat-

est decisions of courts in this country and in England show a strong tendency to very greatly circumscribe and narrow the doctrine of avoiding contracts in restraint of trade. The courts do not go to the length of saying that contracts which they now would say are in restraint of trade are nevertheless valid contracts, and to be enforced. They do, however, now hold many contracts not open to the objection that they are in restraint of trade, which a few years back would have been avoided on that sole ground, both here and in England. * * * A business partnership could provide that none of its members should attend to any business other than that of the partnership, and that each partner who came in must agree not to do any other business, and must give up all such business as he had theretofore done. Such an agreement would not be in restraint of trade, although its direct effect might be to restrain, to some extent, the trade which had been done. It seems to me this by-law is a natural and reasonable restraint upon the members of the association, appropriately regulating their conduct as members thereof with respect to the business which the association was especially organized and incorporated to transact. Its success must greatly depend upon the number of its members, and that, in its turn, must depend upon the efficiency, reliability and promptness with which it collects and distributes its news. This by-law, I think, plainly tends to aid the association in the accomplishment of this object.''

Of course, when the board established a rule that no member should have an agency for a company that had an existing agency in the city of Louisville, it was to this extent a restraint upon the right of the

individual. But the mere fact that it restrained him in this particular is not sufficient to condemn it, unless the restraint was unreasonable as to the individual and injurious as to the public. That there may be a reasonable restraint of trade is no longer an open question. Sutton v. Head, 86 Ky. 156, 5 S. W. 410, 9 R. 453, 9 Am. St. Rep. 272; Pyke v. Thomas, 4 Bibb. 486, 7 Am. Dec. 741; Grundy v. Edwards, 7 J. J. Marsh. 368; Davis v. Brown, 98 Ky. 475, 32 S. W. 614, 36 S. W. 534, 17 R. 1428; Chitty on Contracts, p. 982; Diamond Match Co. v. Roeber, 106 N. Y. 473, 13 N. E. 419, 60 Am. Rep. 464; Walter A. Wood Mowing Co. v. Greenwood, 75 S. C. 378, 55 S. E. 973, 9 Am. & Eng. Ann. Cas. 902. The restraint imposed upon the business freedom and liberty of members of the board by the rule in question was not in our opinion unreasonable. It did not force members to retire from the insurance business, or deny to any company the right to have an agency. It only limited the companies to the selection of one agent, and the agent to the choice of companies that did not have an agency, and it appears from the record that this limitation was conclusive to the safe, orderly and legitimate conduct of the business, without being prejudicial to the interests of the public.

The case of Houston v. Reutlinger is overruled in so far as it conflicts with this opinion, and the judgment is reversed, with directions to dismiss the petition.