## Aulich et al. v. Craigmyle et al.

(Decided Jan. 31, 1933.)

(As Modified on Denial of Rehearing May 16, 1933.)

Appeal from Kenton Circuit Court

(Criminal, Common Law and Equity Division).

WHITE & CLARK for appellants.
ROUSE & PRICE and G. W. HUGHES and J. A. CULBERTSON for appellees.

OPINION OF THE COURT BY JUDGE RICHARDSON—Reversing.

This appeal presents for determination the right of seniority of Hugh V. Craigmyle, an employee of the Louisville & Nashville Railroad Company, over the other members of the Order of Railroad Telegraphers.

In May, 1905, he entered the services of the railroad company as a telegrapher on the Kentucky Division, and continued until January, 1913, when he was promoted to train dispatcher on the Eastern Kentucky Division, with headquarters at Jackson, Ky. In April, 1916, he experienced a nervous breakdown, when he sur-

rendered his position as train dispatcher and returned to his home division, known as the Kentucky Division, where he worked as telegrapher until April, 1917, when that part of the Kentucky Division known as the Cincinnati Terminal was separated from the Kentucky Terminal Division into a different seniority division. He was employed on the Cincinnati Terminal Division as a telegrapher from May 1, 1917, until May, 1918, when he was called to Louisville, Ky., as a relief dispatcher, serving in that capacity until September 4, 1918, when a special position of copyist was created for him by the chief dispatcher. He occupied this position until May, 1919, working 112 days as a dispatcher and 104 days as a copyist-telegrapher. From May 1, 1919, until May 27, 1921, he served as a dispatcher in the office of the chief dispatcher of the Louisville, Cincinnati & Lexington Division, until this position was abolished, when he returned to the Cincinnati Terminal Division and asked to be reinstated at his service age. At that time, the railroad company advised him that unless the Order of Railroad Telegraphers would agree to have his service age recognized he would have to enter as a new employee, to which he strenuously objected. He returned to Louisville and worked five days as a telegrapher. In July, 1921, he returned again to the Cincinnati Terminal Division and re-entered the service as a telegrapher and continued in service on this division until November, 1930, when he was retired because his seniority had not been recognized by the Order of Railroad Telegraphers prior to his re-entry of the service on the Cincinnati Terminal Division in July, 1921. Between May, 1918, and July, 1921, while Craigmyle was serving as special dispatcher on the Louisville, Cincinnati & Lexington Division, the Order of Railroad Telegraphers was organized and recognized by the railroad company. The Order of Railroad Telegraphers is a voluntary association, composed of wire chiefs, telegraphers, telephone operators (except switchboard operators), agent telegraphers, tower men, lever men, tower and train directors, block operators, operators of mechanical telegraph machines, and telephone men, employed by, and working on, the various railroad systems, operating railroads throughout the United States of America, for the purpose of collective bargaining with their employers, through arrangements made by its regular elected officers for and in behalf of

such employees. The order is divided into certain branches so that the named employees working together for any railroad system are associated together in one division. The employees of the Louisville & Nashville Railroad Company, throughout its entire system of railroads, are grouped together under the name of Railroad Telegraphers' System Division No. 56. The order was formed under the laws of the United States of America, and it acts through its authorized and elected officers. It does not enter into any contract for, or on, its own behalf with the railroad companies. It merely persuades and induces the railroad companies to consent to its certain prescribed rules and regulations and conditions of employment, which become a part of the terms of employment of all persons working for the railroad company in the capacity of the employments named, who are members of the association. Prior to the organization of the Order of Railroad Telegraphers in the year 1919, there was no binding agreement as to seniority of employees in the telegraph department, but the employees and the Louisville & Nashville Railroad Company recognized service age, or seniority, everything being equal, the railroad company reserving for itself the final discretion as to whether it would or would not apply the rule of seniority. Prior to that year the railroad company refused its men the right to organize and engage in collective bargaining. An agreement in 1919 was the first contract ever made between the Louisville & Nashville Railroad Company and its employees in the telegraph department. When the railroad was under federal control, the right of collective bargaining was recognized, when an agreement was made by Starks in behalf of the employees and Mapother in behalf of the railroad company. After federal control terminated, the railroad company agreed and continued to recognize the Order of Railroad Telegraphers. In its by-laws of 1919, article 8, section M, was written in this language: "Service age will be dated from the last time of entering the service on the division." On the authority of this section, the Order of Railroad Telegraphers denied his right to seniority, dating from 1905, and the railroad company because of its consent for its employees to organize under their own rules and regulations, refused to recognize Craigmyle's claim to seniority by virtue of his service as its employee, beginning in the year 1905. In March, 1924,

Craigmyle became a member of the Order of Railroad Telegraphers and continued a member thereof, up to, and including, 1929, insisting all the time that he was entitled to his seniority dating from the beginning of his service with the railroad company in 1905. He continued to be employed on the Cincinnati Terminal Division until November, 1930, at which time the railroad company not needing his services placed him on the extra list and retired him from regular duty. In the meantime Craigmyle applied to the Order of Railroad Telegraphers for a hearing on his right to seniority, because of his service with the railroad company from 1905. It decided adversely to him. He protested in writing to the Order of Railroad Telegraphers against its disregard of his claim to the right of seniority, still claiming that his right of seniority dated from his first entry into the service of the railroad company in May, 1905. A roster carrying his name was published every six months from July, 1921, until he was retired, showing the date of his seniority to begin July, 1921, the date of his return to the Cincinnati Terminal.

He filed this action, asserting his right to seniority, dating from his first entry into the service of the railroad company in 1905, and challenged the right of the Order of Railroad Telegraphers to deny to him his seniority, arising by virtue of his employment from 1905 The railroad company recognizes the by-laws of the Order of Railroad Telegraphers and presents itself ready and willing to comply with whatever disposition of the question presented that may be made by the Order of Railroad Telegraphers or the court. The Order of Railroad Telegraphers insists that the seniority, ·or service age, of its members—the employees on the Cincinnati Terminal Division—must date from the last time of their entering the service on the Cincinnati Terminal Division. Craigmyle insists that it was the custom of the Louisville & Nashville Railroad Company during the period of his employment since 1905, to his return to the Cincinnati Terminal Division in 1921, to recognize· seniority according to this custom. A decree was entered requiring the Order of Railroad Telegraphers and the railroad company to recognize his' seniority, dating from May, 1905. The Order of Railroad Telegraphers appeals from this judgment, making Craigmyle and the Louisville & Nashville Railroad Company parties.

The right of working men to form unions, and through their organizations to . enter into agreements with the employers, willing to agree, is so well settled, the question is not now a debatable one. Hitchman Coal & Coke Co. v. Mitchell et al., 245 U. S. 229, 38 S. Ct. 65, 62 L. Ed. 260, L. R. A. 1918C, 497, Ann. Cas. 1918B, 461; Traux et al. v. Bisbee Local No. 380, Cooks' & Waiters' Union et al., 19 Ariz. 379, 171 P. 121; Schlesinger v. Quinto et al., 201 App. Div. 487, 194 N. Y. S. 401.

Craigmyle's cause of action is based on his claim to seniority as against both the Order of Railroad Telegraphers and the railroad company, by virtue of his continuous employment since 1905, and the custom of the railroad company and its employees, during this period of time, to recognize and observe the right of the employees to seniority.

The courts have for a long time used the term "custom" as co-ordinate with "usage," and we will so regard it in our consideration of this case. Thomas v. Charles (Ky.) 119 S. W. 752; Brumfield v. Consolidated Coach Corp., 240 Ky. 1, 40 S. W. (2d) 356; Franklin Sugar Refining Co. v. Kane Milling, etc., Co., 278 Pa. 105, 122 A. 231, 29 A. L. R. 1213. To establish a custom it is not enough to prove the act is frequently done; it must be both alleged and proven to be certain, general, uniform, and recognized. Where it is so alleged and proven, it is a fair presumption that the parties, on entering into their engagement, do it with reference to the custom, and agree that their rights and responsibilities shall be determined by it. A practice to arise to the dignity of a custom so as to enter into and form a part of a contract must possess those elements of certainty, generality, fixedness, and uniformity, as are recognized by the law as essential to constitute a custom. A loose, variable custom or discretionary practice does not arise to the dignity of a custom so as to control the rights of the parties to a contract. If the usage leaves some material element to the right of exercising an option, or discretion, of one of the parties, it does not constitute a custom. Staroske v. Pulitzer Publishing Co., 235 Mo. 67, 138 S. W. 36; Porterfield v. American Surety Co. of N. Y., 201 Mo. App. 8, 210 S. W. 119; Lawrence v. Portland Ry., Light & Power Co., 91 Or. 559, 179 P. 485; Chicago, M. & St. P.

Ry. Co. v. Lindeman (C. C. A.) 143 F. 946; Moffitt v. Connecticut Co., 86 Conn. 527, 86 A. 16; People's National Bank v. Citizens' Savings Bank of Paducah, 239 Ky. 30, 38 S. W. (2d) 959; Huston v. Peters, 1 Metc. 558; Caldwell v. Dawson, 4 Metc. 121; National Seed Co. v. Leavell, 202 Ky. 438, 259 S. W. 1035.

> In the stipulation of facts in this case it is agreed: "That there was no binding agreement as to seniority of the employees of the telegraphic department prior to 1919, but that such right was merely recognized, the railroad company reserving for its discretion, the final decision as to whether it would or would not apply its usage."

This language leaves no doubt in the disinterested mind that the railroad company was under no obligation to recognize or observe the rights of seniority of its employees, unless it chose in the exercise of its discretion to do so and clearly distinguishes this case from Piercy v. L. & N. R. R. Co., 198 Ky. 477, 248 S. W. 1042, 33 A. L. R. 322. We are convinced in the present case that there was no such custom existent and recognized by either the company or its employees between 1905 and July, 1921, sufficient to support the presumption that the right of seniority was a part of Craigmyle's contract of employment. The converse is established, i. e. his seniority was to be determined and fixed in the discretion of the railroad company at the time the right thereto was asserted by him. When he returned to the Cincinnati Terminal Division in 1921, his right to seniority or service age was optional, or discretionary, with the railroad company and was not enforceable against it, as a part of his contract of employment. It cannot be doubted that if at that time it had placed him on the extra list and retired him, whether with or without the consent of, or pursuant to its obligation to, the Order of Railroad Telegraphers, no cause of action therefor would have accrued in his favor, against either the railroad company or the Order of Railroad Telegraphers.

The members of the Railroad Telegraphers' Union possessed the absolute right to formulate and adopt such constitution and by-laws as they deemed proper to accomplish the purpose of the organization. Being a voluntary association, its constitution and by-laws be-

come a part of the obligations entered into by a member when he joins. In a controversy between a member and the association, the remedies provided by its constitution and by-laws were the remedies within the organization, and as a general rule they must be exhausted before an appeal by a member to the courts. Emma v. Loggia Fasci Italici, 145 A. 630, 7 N. J. Misc. 387; Roxbury Lodge v. Hocking, 60 N. J. Law, 439, 38 A. 693, 64 Am. St. Rep. 596. The general applicable rules in such cases were formulated and stated in Roxbury Lodge v. Hocking, supra; Walsche v. Sherlock, 110 N. J. Eq. 223, 159 A. 661. It is not within the province of the court to inquire into and determine the expediency, practicability, or wisdom of the constitution and by-laws of the Order of Railroad Telegraphers, nor to relieve its members of the operation or enforcement thereof, so long as they do not violate, trespass upon, or destroy the property or contractual right of its members, or transgress the bounds of reason, or contravene public policy or the laws of the land. In connecting himself with the organization, Craigmyle subjected himself fully and completely to the power of its administration, within the legal limits of the power of the organization. On becoming a member thereof his right of seniority was controlled thereafter by its by-laws which were at that time in force, or thereafter adopted. Fish v. Huddell, 60 App. D. C. 263, 51 F. (2d) 319; Yazoo & M. V. R. R. Co. v. Sideboard, 161 Miss. 4, 133 So. 669; Malloy v. Carroll, 272 Mass. 524, 172 N. E. 790; State ex rel. Smith v. Kanawha County Court, 78 W. Va. 168, 88 S. E. 662, 20 A. L. R. 1030. His right to seniority before becoming a member of the organization was subject to the right of adoption, or discretion, of the railroad company to recognize it or not. His right thereto prior to his return to the Cincinnati Terminal was in no sense a vested, contractual, or property right, justifying the court, either then or now, in interfering to preserve it. Schaup v. Grand International Brotherhood of Locomotive Engineers et al., 223 Ala. 202, 135 So. 327; Porterfield v. American Surety Co., supra; McConville v. Milk Wagon Drivers' Union, 106 Cal. App. 696, 289 P. 852, 853; Clark v. Morgan, 271 Mass. 164, 171 N. E. 278.

This case does not present for review the action of the Order of Railroad Telegraphers in determining

684

Craigmyle's right to seniority by virtue of its constitution and by-laws; nor do we determine his rights thereunder or express any opinion respecting the same. His privilege and right as a member thereof to apply to the Order of Railroad Telegraphers for a hearing or a determination of his right as a member of that order, under article 8, section M, or article 12, sections A and B, or any other article or section of the rules and regulations of the order, are not affected by the opinion herein.

The parties in their briefs have presented other questions, but, in view of our conclusions, it is not necessary to accord a fair and full consideration of the case, to treat them in this opinion.

The appellee, in his pleadings and in his brief, presents impelling equities, but with the facts as presented, and adhering to the stated, applicable, and controlling principles, it is our conclusion the circuit court erred in granting the relief afforded by his judgment.

Therefore it is reversed, for proceedings consistent with this opinion.